COMMONWEALTH *vs.* MARK LEVASSEUR.

No. 91-P-668.

Middlesex. December 12, 1991. - June 5, 1992.

Present: PERRETTA, PORADA, & GREENBERG, JJ.

*Identification. Evidence,* Relevancy and materiality. *Rape. Practice, Criminal,* Assistance of counsel, Instructions to jury.

At the trial of indictments for rape and indecent assault and battery, ineffective assistance of counsel was not shown by the defense attorney's failure to seek suppression of evidence of the victim's one-on-one identification of the defendant, where no reasonable likelihood existed that a suppression motion, if filed, would have been allowed. [635-637]

At the trial of indictments for rape and indecent assault and battery, ineffective assistance of counsel was not shown by the defense attorney's failure to object to police officers' testimony concerning the defendant's offering a female pedestrian a ride in his pickup truck about two weeks after the events in issue, where the challenged testimony was properly admissible. [637-638]

At a criminal trial, there was no basis for objection to portions of the judge's instructions to the jury on the issue of identification. [638-639]

INDICTMENTS found and returned in the Superior Court Department on March 16, 1989.

The cases were tried before *John P. Forte,* J., sitting under statutory authority and a motion for a new trial was heard by him.

*Thomas J. Gleason* for the defendant.

*Patricia M. Darrigo,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On his appeal from convictions by a jury on indictments charging rape and indecent assault and battery, the defendant argues that his trial attorney was ineffective. He contends that his convictions must be reversed because of his attorney's failure to file a motion to suppress the victim's one-on-one identification of him and to object to certain evidence and the jury instructions. We conclude that the alleged

shortcomings of counsel did not deprive the defendant of an available defense and affirm the convictions.

1. *The evidence.* There was evidence, the victim's testimony, to show that on the night of June 30, 1988, the victim and a friend went to the Foxtail, a lounge in Lowell. Because the victim did not have a purse, she asked her friend to carry her wallet. They stayed at the Foxtail a while and then walked about a quarter of a mile down the road to another lounge, Chevy's.

Once inside Chevy's, the victim and her friend became separated. Because she was without her wallet, the victim decided that she would return to the Foxtail in the hope that there she would meet up with her friend. It was some time after midnight when she started back to the Foxtail. As she walked along the road, a man driving a large, dark-colored, "4 x 4," pickup truck pulled up. He drove alongside her and repeatedly asked if she would like a ride. At first the victim ignored him, next she explained that she was only going a short way down the road, and finally, not wanting to hurt his feelings, she relented. The driver reached over, opened the door, and helped the victim as she climbed up into the truck.

At first, the victim thought that the driver went past the Foxtail to find a parking space. Apprehension turned to alarm as he drove down deserted streets and stopped behind a large building. The man grabbed the victim, forced her back on the seat, and raped her. Still restraining the victim, he began to drive away. As he drove, she was struggling and fighting with him. He reached over, opened her door, and pushed the victim out of the truck. She fell out of the truck face first, landing in the street on her hands. The driver raced away.

Another witness testified that he drove up behind the truck just as the victim was being thrown onto the street. He described the truck as a dark blue or black "4 x 4." He drove the victim, who was crying and in a state of panic, to his nearby home so that his wife could help her. The victim would not allow anyone to touch her, and she would not talk. It took the witness's wife some effort to persuade the victim to write out her boyfriend's telephone number. The witness called the boyfriend and the police. Upon their arrival, they

found the victim curled up on the floor in a corner of the bathroom. The victim was taken to the hospital in an ambulance. Although the police followed and waited over two hours, they could not get any helpful statement from the victim. She was still distraught when she later left the hospital with her boyfriend.

About a week later, on July 6 and 7, Inspector John Boutselis of the Lowell Police Criminal Bureau was able to interview the victim. She described her assailant as being of medium build with a thin face, high cheekbones, dark hair, dark eyelashes and a small mustache. The victim viewed approximately 6,000 photographs of white males. There was a picture of the defendant, taken in 1983, among those photographs. Although the victim noted that several people looked similar to the man who had raped her, she was unable to make an identification.

In the course of their investigation of this matter, on July 13, Boutselis and his partner, Inspector John Guilfoyle, were driving toward the defendant's house in North Chelmsford. They were on School Street in Lowell, when they saw the defendant driving a dark blue "4 x 4" pickup truck. The victim had described the interior of the truck as smelling "new," and the police observed that the truck was shiny and well-maintained. Boutselis pulled over and heard the defendant call out, "Come on," to a young girl, about sixteen years of age, as she walked along the sidewalk near the truck.

After confirming the registration, the two officers stopped the defendant, and he produced his license as requested. When asked about the identity of the young girl to whom he had called out, the defendant stated that she was his cousin and he had offered her a ride. The police asked for her name, but the defendant did not answer. Boutselis told the defendant that they were investigating an assault and asked whether he would come to the police station for an interview. Boutselis described the defendant as "very forward and aggressive in his eagerness to cooperate with us." Upon his arrival at the police station, the defendant was advised of his rights. He consented to being photographed and told the police that he was employed at Avco, in Wilmington, working the 7:00 A.M. to 3:00 P.M. shift. He also drove a truck in the

morning for a delivery company. In response to questioning, the defendant stated that on June 29, at midnight, he was home with his family. On June 30, about 9:00 P.M., he was in downtown Lowell, but he could not remember his precise whereabouts. When first asked, he denied being acquainted with any prostitutes in the Market and Merrimack Streets area, the vicinity of the rape. He then admitted that he had relationships with several prostitutes in that area and added that his wife was unaware of that fact. Once the defendant understood that the police were investigating a rape complaint, he stated that he wanted to leave and speak with his family. He later returned to the station with his wife and mother-in-law and advised the police that he would make no further statements.

The victim returned to the police station the next day, July 14, and Boutselis showed her a group of sixty photographs. The picture of the defendant, taken the day before, was included in this array. The victim stopped her scrutiny of the pictures at the defendant's photograph. She exclaimed, "This looks like him! This could be him!" She asked whether there were any other pictures of the man depicted in the photograph she had selected, and the police gave her the picture of the defendant taken in 1983.

When the victim commented that the second (1983) photograph was more consistent with the defendant's appearance on the night of the rape, Boutselis asked her whether she was "comfortable" or "confident" enough to make a "positive identification." The victim responded that, because of the serious nature of the charges, she wanted to be "sure." She suggested that for her to be certain, she wanted "to see him."

On nine separate occasions, from July through December, Boutselis and the victim drove to Wilmington and North Chelmsford. The victim observed thousands of vehicles and people. On five of those nine occasions, Boutselis drove the victim to the plant in Wilmington where the defendant had stated he was employed. Four trips, including the last, were taken to North Chelmsford. On the last occasion, December 16, at 2:00 P.M., Boutselis and the victim were sitting in his parked car. Several cars and trucks passed them. At about 3:20 P.M., Boutselis noticed that a blue, "4 x 4"

pickup truck was approaching. The truck was about thirty yards away before the victim, without comment or prompting from Boutselis, noticed it. She was silent at first, leaning forward to peer out the window. As the truck came closer, she stated, "Wow! This looks like it!" The truck passed within six feet of them, and Boutselis saw that the defendant was behind the wheel. The victim began to scream, "It's him! Get me out of here right now!" Boutselis asked whom she was talking about, and the victim stated that the driver of the truck was the man whose picture she had selected, he was the man who had raped her. Boutselis drove back to the police station. The victim was sobbing uncontrollably and would not get out of the car.

Testifying on his own behalf, the defendant related that on June 30, 1988, at about 9:00 P.M., he and his wife went for pizza on Broadway in Lowell, drove home, watched television, and retired for the night. He drove a truck, which he described as a 1986 Ford F250, "4 x 4," with a three-inch lift kit, smoked glass, and extra heavy duty suspension. He intimated that he thought Boutselis might have a grudge against him. He stated that he once cut Boutselis off in traffic. Boutselis made a check for outstanding warrants against the defendant, asked him whether there were drugs in the truck, and told him, "Next time I won't be so easy on you."

The defendant explained that the girl Boutselis had seen him call to from his truck on July 13 was his aunt's cousin. He had gone swimming with his aunt and her cousin and had brought his aunt to her house first. He had just dropped off the cousin when Boutselis saw him. The cousin was twenty-seven or twenty-eight years old and might be a prostitute. The defendant no longer knew where she lived. When the police asked him if he would go to the station and answer questions and when they advised him of his rights, they told him only that they were investigating unspecified crimes. He told them that he worked at Digital in Woburn and that he knew several prostitutes, who were friends of his, in the Lowell area.

Explaining why he interrupted his interview with the police on July 13, the defendant related that he was in casual dress and felt out of place at the station. He went home to

change and met his wife. They went to pick up his mother-in-law at a place where she was playing bingo, and they all returned to the station. Although a police officer refused to talk with the mother-in-law about the complaints, he had been willing to cooperate. He offered to take a lie detector test or provide the police with a sperm sample.

In support of the defendant's alibi defense, his wife testified that on the night of the rape, she and her husband had gone for pizza, returned home, watched television, and then went to bed. She also related that she was a heavier sleeper than her husband. He was a "sleepeater," and on several occasions in the past, he had gotten up at night without awakening her, to go to the refrigerator. When the defendant came home on July 13, after his initial interview at the police station, he told her that the police had accused him of raping a girl on or about July 2, 3, or 4. He asked her whether she could remember what they had done on those dates, and they had a difficult time recalling anything other than the fact that they had gone for pizza the night of June 30. She also did not know the cousin's address, although she knew that the cousin lived in Lowell and she knew how to get to her house. The witness also stated that the only reason her husband would have for being on School Street in Lowell would be if he were "cruising around."

The defendant also called his mother-in-law as a witness. She testified that she went to the police station with her daughter and the defendant on July 13. A police officer refused to answer any of her questions about the investigation. The defendant told the police, in her presence, that he worked at Digital.

Inspector Guilfoyle of the Lowell police department was called in rebuttal by the Commonwealth. Guilfoyle testified that on July 13, he and Boutselis were stopped at a traffic light. Guilfoyle noticed a young girl, about sixteen years of age, walking along School Street. A dark blue pickup truck came along in the oncoming lane. The driver, the defendant, pulled over at an angle to the curb, just in front of the young girl. Keeping his left hand on the steering wheel, he leaned over the passenger seat and made motions to her with his right hand. Moments later he drove away. The officers made

a U turn, drove up to the girl, identified themselves as police officers, and asked her whether she knew the man in the truck. She said that she did not and that he had offered her a ride. The officers then caught up with and stopped the truck and asked the defendant if he would come to the police station. Guilfoyle's version of the events at the station that day was consistent with Boutselis's testimony.

2. *The failure to seek suppression.* Because the defendant's argument is made in the context of an allegation of incompetency of counsel, the question for resolution is "whether there is a reasonable likelihood that, if a pretrial motion to suppress had been filed, it would have been allowed. See *Commonwealth* v. *Lykus,* 406 Mass. 135, 140 (1989)." *Commonwealth* v. *Lee, ante* 85, 86 (1992). We will assume for purposes of our decision that "it is unlikely that any strategic considerations prevented counsel from moving to suppress." *Id.* at 85.

It is the December identification which the defendant claims should have been made the subject of the motion. Had defense counsel filed a motion to suppress that identification, it would have been the defendant's burden "to show, by a preponderance of the evidence, that, considering the totality of the circumstances attending the particular identification, the witness was subjected by the State to an identification so unnecessarily suggestive and conducive to irreparable misidentification as to deny . . . [ him ] due process of law. *Commonwealth* v. *Botelho,* 369 Mass. 860, 865-868 (1976), citing *Stovall* v. *Denno,* 388 U.S. 293, 301-302 (1967)." *Commonwealth* v. *Holland,* 410 Mass. 248, 253 (1991).

It is important to note at the outset that, although Boutselis arranged for the victim to be in a place where he thought the defendant might show up, this procedure was not employed to avoid an identification at a lineup. The police cannot be said to have acted unreasonably on July 13, in refraining from arresting the defendant. The victim had declined to make a positive identification, because of the serious nature of the charge, without first seeing the defendant, who had indicated on July 13 that he would no longer speak

to or cooperate with the police. See *Commonwealth* v. *Chase*, 372 Mass. 736, 743 (1977).

Much is made by the defendant of the fact that the disputed confrontation did not take place soon after the crime. Many cases have discussed the reason why showups should occur promptly after the crime. As stated in one of them, *Commonwealth* v. *Barnett*, 371 Mass. 87, 92 (1976): "To have the witness view the suspect while his recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture, provides the witness with good opportunity for an accurate identification." There is, however, no requirement that the identification be suppressed on the sole basis that there has been a time lapse between the crime and the showup. Rather, the delay is but one factor to be considered in determining whether, in the totality of the circumstances, the identification was inherently or unnecessarily suggestive. See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 790 (1977); *Commonwealth* v. *Holland*, 410 Mass. at 253.

Turning to the undisputed evidence of those circumstances, we begin with the fact that the victim requested the showup. Moreover, she did so after she had described her assailant to the police and after she had selected his photograph. Her request was based upon an appreciation of the seriousness of what she what was doing and not upon any uncertainty about the picture she had selected. There was no delay by the police in attempting to accommodate her request to see the defendant in person before making a "positive" identification, and they made no comments to her concerning the man whose picture she had selected. See *Commonwealth* v. *Libby*, 21 Mass. App. Ct. 650, 655 (1986). Compare *Commonwealth* v. *Correia*, 381 Mass. 65, 71 (1980); *Commonwealth* v. *Riley*, 26 Mass. App. Ct. 550, 552 (1988).

The victim's identification was made after eight unsuccessful trips to the general vicinity of those places, employment and residence, where the police thought the defendant might appear. Upon sighting the truck matching the description that she had given the police soon after the rape, she said only, "This looks like it!" Staring out the window, the victim

watched as the vehicle came closer. She did not make an identification until she saw the driver of the truck as he passed within six feet of her. It was upon seeing the driver, not the truck, that the victim became upset, demanded that she be taken away, and began to sob uncontrollably. See *Commonwealth* v. *Melvin*, 399 Mass. 201, 206-207 & n.9 (1987).

Even if there was an element of suggestiveness in the showup, we nonetheless would conclude that, in the totality of the circumstances, the victim's identification "was not so unnecessarily suggestive and conducive to misidentification as to deny the defendant due process of law." *Id.* at 207.[1] As any motion to suppress would have to have been denied, the defendant has not shown that the failure to file such a motion deprived him of the effective assistance of counsel at his trial. See *Commonwealth* v. *Lykus*, 406 Mass. at 142-143; *Commonwealth* v. *Lee, ante* at 90-91.

3. *The failure to object to certain evidence.* We do not think that a successful objection could have been taken either to the officers' testimony concerning their observations of the defendant with the girl he claimed to be his cousin or to Guilfoyle's testimony relating what the girl had told the officers. The only question at trial was whether the defendant was the man who offered the victim a ride and then raped her. The defense was misidentification. The fact that the defendant, two weeks after the crime, was seen offering a young girl a ride had relevant purposes and was admissible to show modus operandi. See *Commonwealth* v. *Campbell*, 371 Mass. 40, 42-43 (1976); *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1991); *Commonwealth* v. *Deschamps*, 1 Mass. App. Ct. 1, 2-3 (1972), quoting from *Harper* v. *United States*, 239 F.2d 945, 946 (D.C. Cir. 1956). Contrast *Com-*

---

[1] The victim had ample opportunity (from the time she accepted the ride until she was thrown out of the truck) to observe the defendant. Her description to the police provided details as to his physical features, clothing, and truck. Notwithstanding the fact that she was shown over 6,000 pictures of white males, she never selected a photograph of someone other than the defendant. Her refusal to make a positive identification from a photograph was not due to uncertainty. Rather, she appreciated the consequences of her selection. See *Commonwealth* v. *Riley*, 26 Mass. App. Ct. at 553-554.

*monwealth* v. *Yelle,* 19 Mass. App. Ct. 465, 471 (1985), where the question was consent and the court concluded that evidence of modus operandi was irrelevant and should have been excluded. The defendant was not entitled to the exclusion of this evidence.

Guilfoyle's testimony, that the girl told him that the defendant had offered her a ride, was not improper. Boutselis testified that he heard the defendant call to her, "Come on," or words to that effect. The defendant told the officers that he had offered the girl, his cousin, a ride, and he did not answer when they asked him where she lived. This testimony was admissible. Guilfoyle did not take the witness stand until after the defendant had testified that the girl was his aunt's cousin, that she was about twenty-seven or twenty-eight years old, that she just had gotten out of the truck when the officers saw him, that he had not seen her in over a year, and that he did not know where she lived. Even assuming that Guilfoyle's testimony concerning his conversation with the girl would have been excluded upon objection, but see *Commonwealth* v. *Sullivan,* 410 Mass. 521, 526-527 (1991), we would conclude that, in light of the testimony about this occurrence given by Boutselis, the defendant, and the defendant's wife, defense counsel's failure to object did not contribute to the verdict or otherwise deprive the defendant of a substantial ground of defense. See *Commonwealth* v. *Saferian,* 366 Mass. 89, 96-99 (1974).[2]

4. *The jury instructions.* There was no basis for objections to those two portions of the jury instructions which the defendant claims to be erroneous. In his closing argument to the jury, defense counsel presented a litany of deficiencies in the police investigation, including the officers' purported failure to call the victim to the station to identify the defendant in person on July 13. See *Commonwealth* v. *Rodriguez,* 378

---

[2]Our reasoning on this issue is also dispositive of the defendant's claim concerning his conflicting statements to the police about his relationships with prostitutes who worked in the general vicinity of the area where the rape occurred. As for the numerous other alleged examples of defense counsel's shortcomings, we do not consider them. See *Penta* v. *Concord Auto Auction, Inc.,* 24 Mass. 635, 642 (1987); Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

Commonwealth *v.* Levasseur.

Mass. 296, 308 (1979). In this case, however, the police could not have taken such action. See *Commonwealth* v. *Chase*, 372 Mass. at 742. It was open to the trial judge to correct any probable misunderstanding of the law by the jury in his instructions to them.

It is not incumbent upon a trial judge to give all the suggested instructions set out in *Commonwealth* v. *Rodriguez*, 378 Mass. at 310-311. "[T]hey may be modified or embellished as the evidence and allegations at trial require." *Id.* at 310 n.1. See also *Commonwealth* v. *McMaster*, 21 Mass. App. Ct. 722, 727 (1986). Based upon the evidence, we see no error in the trial judge's decision to omit from his charge the *Rodriguez* instructions set out in the margin.[3]

> *Judgments affirmed.*
> *Order denying motion for new trial affirmed.*

---

[3]"You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

"You may take into account any occasions in which the witness failed to make an identification of [the] defendant, or made an identification that was inconsistent with his identification at trial." 378 Mass. at 311.

Although the victim did not select the 1983 photograph of the defendant, she did identify him in the second, more recent picture. All her identifications were consistent with each other as well as with the description she gave to the police at the outset.