# United States Court of Appeals
## For the First Circuit

No. 22-1846

MICHEL ST. JEAN,

Petitioner, Appellant,

v.

RAYMOND MARCHILLI, Superintendent,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Kayatta, Circuit Judges.

Rosemary Curran Scapicchio, with whom Law Office of Rosemary C. Scapicchio was on brief, for appellant.
Nicole Nixon, Assistant Attorney General, with whom Andrea Joy Campbell, Attorney General of Massachusetts, was on brief, for appellee.

September 23, 2024

**SELYA**, **Circuit Judge**.  In this appeal, petitioner-appellant Michel St. Jean, a state prisoner, challenges the dismissal of his federal habeas petition, which asserted violations of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments.  After careful consideration, we affirm the denial of habeas relief.

**I**

We briefly rehearse the relevant facts and travel of the case.  "Because this appeal involves a challenge to evidentiary sufficiency, we rehearse the facts in the light most compatible with the jury's verdict, consistent with record support." Leftwich v. Maloney, 532 F.3d 20, 21 (1st Cir. 2008).  In conducting this analysis, we are aware of the fact that — on habeas review — "a determination of a factual issue made by a State court" is "presumed to be correct."  28 U.S.C. § 2254(e)(1).  This presumption extends to factual findings made by state appellate courts in the course of direct review.  See Teti v. Bender, 507 F.3d 50, 58 (1st Cir. 2007).  In turn, we draw upon the facts recited by the Massachusetts Supreme Judicial Court (SJC), supplemented by other facts in the record consistent with that recitation.  See Companonio v. O'Brien, 672 F.3d 101, 104 (1st Cir. 2012).

The saga begins on September 1, 2010. On that afternoon, the petitioner, Alexander Gallett, and Gallett's girlfriend,

Yamiley Mathurin, were at Aline Valery's house in Hyde Park, Boston. Before leaving her residence, Valery overheard the three hatching a plan to rob someone. That evening, around 8 P.M., the trio boarded a bus to a vacant house in the neighborhood. At approximately 11 P.M., Mathurin asked Marie Tunis — who lived next to the vacant houses — for permission to use her telephone. Once leave was granted, Mathurin proceeded to call a pizzeria and order pizzas, chicken wings, and soda. She requested that the food be delivered to the back door of the address of the vacant house and provided the petitioner's cell phone number as the call-back number. She also asked if the delivery driver would have change for a one-hundred or fifty-dollar bill.

At 11:30 P.M., Gallett borrowed a passerby's cell phone and called the same pizzeria. The passerby testified at trial that Gallett made the call while in front of the vacant house.

Richel Nova (the victim) arrived shortly thereafter with the delivery. Mathurin escorted him up the rear staircase of the vacant house. Five minutes later, the petitioner, Gallett, and Mathurin — who was holding a pizza box — left the house and got into the victim's vehicle. The petitioner proceeded to drive the vehicle away.

After witnessing the three drive away, Michael Tunis, along with his brother and friend, entered the vacant house. Tunis found blood and chicken wings on the floor near the entryway. In

- 3 -

a room off the kitchen, Tunis discovered the victim lying on his back unresponsive and with visible puncture wounds. Tunis proceeded to call the police, who arrived at the vacant house around 12 A.M. They found the victim's body on the floor with his pant pockets pulled inside out. They also found a pizza warmer bag, a bloody chicken wings box, a knife handle, a bloody and slightly bent knife blade, and blood on the door frame leading into the kitchen.

Meanwhile, the petitioner, Gallett, and Mathurin drove the victim's vehicle to the rear of a church parking lot — where it was later found. The pizzeria sign that had previously been atop the vehicle was found discarded behind the church. A white pizza box with a label listing the vacant house as the delivery address and the petitioner's cell phone number as the call-back number was recovered either near or inside the vehicle. Empty bleach and rubbing alcohol bottles were also found in proximity to or inside the vehicle.

Having abandoned the victim's vehicle, the three returned to Valery's house. They smelled of bleach and appeared anxious. Gallett had blood on his shirt and on the bottom of his shoes, while the petitioner had a cut on his right hand and was using a bandana to try and stop the bleeding.

Within two days, the police arrested the petitioner, Gallett, and Mathurin. All of them were later indicted for first-

degree murder, armed robbery, and breaking and entering in the nighttime with intent to commit a felony. Mathurin pleaded guilty. The petitioner and Gallett proceeded to trial before a jury. At the trial, redacted inculpatory statements from both the petitioner and Gallett were introduced into evidence as audio-video recordings. An abundance of forensic evidence that implicated the two defendants was also introduced, including fingerprints and deoxyribonucleic acid (DNA) found at the vacant house, in the victim's car, on the victim, on the pizza box, on the defendants' clothing, and on money that Mathurin gave to police following her arrest. Throughout, the petitioner argued that, although he admittedly broke into and entered the vacant house, he neither participated in the victim's murder or robbery nor did he share the intent to commit the crimes.

On September 23, 2014, a state-court jury returned a general verdict finding the petitioner and Gallett guilty of first-degree murder under the theories of felony-murder and extreme atrocity and cruelty, armed robbery, and breaking and entering with intent to commit a felony. The petitioner was sentenced to life in prison without parole for first-degree murder, a concurrent five-to-seven-year sentence for armed robbery, and a concurrent one-to-three-year sentence for breaking and entering with intent to commit a felony.

On direct review, the SJC affirmed.  See Commonwealth v. Gallett, 119 N.E.3d 646 (Mass. 2019).  In its opinion, the SJC rejected a multitude of the petitioner's contentions, including a challenge to the sufficiency of the evidence, a challenge to the admission of statements from Gallett's redacted police interrogation, a challenge to the admission of his own redacted statements, a challenge to various jury instruction requests, a challenge to the judge's statements to the jury as prejudicial, and a challenge to the judge's decision to limit the cross-examination of a medical examiner.  The court concluded by stating that its review of the entire record, pursuant to Mass. Gen. Laws ch. 278 § 33E, revealed no reason to disturb the verdict.  See id. at 652, 669.

Fifteen months later, the petitioner repaired to the federal district court in search of a writ of habeas corpus.  He named as the respondent the superintendent of the North Central Correctional Institution in Gardner, Massachusetts (for ease in exposition, however, we shall treat the Commonwealth of Massachusetts as the real party in interest).  The petitioner advanced seven claims of error, all of which were rejected by the district court.  See St. Jean v. Marchilli, No. 1:20-11139, 2022 WL 4817108, at *4 (D. Mass. Oct. 3, 2022).  This timely appeal followed.

We review de novo a district court's denial of a habeas petition.  See Porter v. Coyne-Fague, 35 F.4th 68, 74 (1st Cir. 2022).  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. § 2254), we shall withhold a writ of habeas corpus unless the state court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This first showing, described in section 2254(d)(1), is further divided into two distinct avenues for relief:  the "contrary to" clause and the "unreasonable application" clause.

The "contrary to" clause applies when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).  The "unreasonable application clause" applies when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case." Id. The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. Although state courts must "reasonably apply" existing Supreme Court precedent, they do not need to "extend that precedent." White v. Woodall, 572 U.S. 415, 426-27 (2014) (emphasis in original). Moreover, the phrase "unreasonable application" means that the state court's application of the Supreme Court's holdings "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." Id. at 419 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). The state court's application of the Supreme Court's holdings is unreasonable "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id. at 427 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). Finally, "evaluating whether a rule application was unreasonable requires considering the rule's specificity," such that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

The second showing, described in section 2254(d)(2), requires that the state court's decision be "based on an

unreasonable determination of the facts" on the record before that court. This showing cannot be made when "'[r]easonable minds reviewing the record might disagree' about the finding in question." Brumfield v. Cain, 576 U.S. 305, 314 (2015) (alteration in original) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Even if we determine that a state court's decision involves an unreasonable application of clearly established federal law, "habeas relief will not follow automatically." Foxworth v. St. Amand, 570 F.3d 414, 425 (1st Cir. 2009). Prejudice is essential: only if the error is shown to have prejudiced the petitioner and "had a 'substantial and injurious effect or influence in determining the jury's verdict'" will habeas relief be warranted. Delaney v. Bartee, 522 F.3d 100, 105 (1st Cir. 2008) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)).

The short of it is that our review of a state court's decision on the merits is subject to a number of "peculiarly deferential standards." Porter, 35 F.4th at 74 (quoting Cronin v. Comm'r of Prob., 783 F.3d 47, 50 (1st Cir. 2015)). Yet, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." Id. at 75 (alteration in original) (quoting Brumfield, 576 U.S. at 314).

With this framework in place, we turn to an examination of the petitioner's claims regarding the SJC's opinion. We first

examine his contention that the SJC failed to follow clearly established precedent when it rejected his argument that there was insufficient evidence that he acted as either a principal or joint venturer in the killing and denied his motion for a required finding of not guilty. Next, we address his contention that the SJC's holding — that the trial court did not violate his Confrontation Clause rights when it allowed the jurors to read his codefendant's redacted statements — was based on an unreasonable determination of the facts and/or a misapplication of federal precedent. Third, we address his contention that the SJC misapplied clearly established precedent in holding that the trial court's refusal to allow him to cross-examine the medical examiner about the location of the wounds on his hands was harmless error. We then proceed to his contention that the SJC departed from clearly established precedent and made its decision on the basis of an unreasonable determination of the facts when it found no error in the trial court's failure to provide various jury instructions. Finally, we consider his contention that the SJC's decision that the trial court committed no error when it told the jurors that they were part of "the government" was contrary to and an unreasonable application of clearly established precedent.

### A

The petitioner's first contention is that the SJC unreasonably sustained his conviction because the evidence was

insufficient to support a jury finding beyond a reasonable doubt that he acted as either a principal or joint venturer in the killing of the victim. In his view, this insufficiency violated his constitutional due process right to be convicted only upon proof beyond a reasonable doubt of every element of a crime. See In re Winship, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Jackson v. Virginia, 443 U.S. 307 (1979), provides the clearly established federal law governing direct review of sufficiency claims. Jackson instructs a reviewing court to ask "the relevant question [of] whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).

In reviewing a habeas petition that raises a sufficiency claim under Jackson, we apply — in light of AEDPA's command that we may not overturn an underlying state court decision rejecting a sufficiency challenge unless the decision is "objectively unreasonable," Parker v. Matthews, 567 U.S. 37, 43 (2012) (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011)) — a "twice-deferential standard," id. Our inquiry focuses on "whether the state court['s] ruling that the evidence is constitutionally sufficient was itself

- 11 -

'unreasonable.'" Winfield v. O'Brien, 775 F.3d 1, 8 (1st Cir. 2014) (quoting 28 U.S.C. § 2254(d)(1)). "'Unreasonable' in this context means that the decision 'evinces some increment of incorrectness beyond mere error.'" Id. (quoting Leftwich, 532 F.3d at 23).

With these principles in mind, we consider the SJC's resolution of the petitioner's sufficiency challenge. Before the SJC, the petitioner contended that the evidence was insufficient to establish that he acted as either a principal or joint venturer in the killing. See Gallett, 119 N.E.3d at 658. The Commonwealth argued that there was sufficient evidence to support a conviction under a theory of felony-murder — with armed robbery as the predicate felony — and under a theory of extreme atrocity and cruelty. See id.

Following established Massachusetts law, the SJC determined that it did not need to "examine the sufficiency of the evidence separately as to principal and joint venture liability," but could limit its inquiry to "whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime." Id. (quoting Commonwealth v. Zanetti, 910 N.E.2d 869, 884 (2009)). Building on this foundation, it observed that the Commonwealth only had to prove that the petitioner "was a joint venturer in an

armed robbery and that the victim's death occurred in the commission or attempted commission of that armed robbery." Id.

To find the petitioner guilty under a theory of felony-murder with armed robbery serving as the underlying felony, the SJC explained, the Commonwealth had to prove that he "was part of a venture in which at least one of the coventurers was armed with a dangerous weapon, either applied violence to the victim's body or put the victim in fear, and took the victim's property with the intent to steal it." Id. Viewing the evidence in the light most favorable to the Commonwealth, the SJC determined that:

> Valery testified that she overheard the [petitioner, Gallett,] and Mathurin planning to rob someone. . . . The [petitioner, Gallett,] and Mathurin ordered pizza to be delivered to a vacant house. Mathurin asked if the delivery driver could change a one hundred or fifty dollar bill. [The petitioner] always carried a knife on his person, and Gallett carried his knife when he left the house. The jury reasonably could infer that [the petitioner] was armed with a knife; thus, the Commonwealth was not required to prove that [the petitioner] knew that Gallett was armed.
> The victim was lured into the vacant house and stabbed sixteen times. There was evidence of [the petitioner]'s bloody footprints inside the house, and [the petitioner] had the victim's blood on his jeans. Furthermore, Tunis testified that he saw Mathurin walk the victim to the rear door of the house and then witnessed the [petitioner, Gallett,] and Mathurin leave together. The jury could reasonably infer that [the petitioner] was inside the house. With [the petitioner] driving the victim's vehicle, the [petitioner, Gallett,] and

- 13 -

Mathurin then fled the scene. The [petitioner, Gallett,] and Mathurin abandoned the vehicle at the rear of a church parking lot. . . . Valery testified that the [petitioner, Gallett,] and Mathurin were nervous and smelled of bleach when she saw them later that night. Upon discovering the victim's body, police noticed that the victim's pockets were turned inside out. Reasonable inferences from the evidence showed that [the petitioner] was armed with a knife, either applied violence to the victim's body or put the victim in fear, and took the victim's property — the pizza, money, and vehicle — with the intent to steal it.

Id. at 658-59. Given these facts, the SJC supportably concluded that "[t]he evidence was more than sufficient to permit a reasonable jury to find that the [petitioner] committed the murder under a theory of felony-murder." Id. at 658.

There was more. To find the petitioner guilty under a theory of extreme atrocity or cruelty, the SJC explained that the Commonwealth had to prove that he "knowingly participated in the killing, that he intended to cause death or grievous bodily harm or engaged in an act a reasonable person would know created a plain and strong likelihood of death, and that the killing was committed with extreme atrocity or cruelty." Id. at 659. Assessing the evidence in the light most favorable to the Commonwealth, the SJC reasonably determined that:

Fair inferences from the evidence showed that [the petitioner] was armed with a knife, planned to rob someone, lured the victim into the vacant house, and attacked the victim. The victim was stabbed sixteen

- 14 -

times. . . . [The petitioner] always carried a knife and had the victim's blood on his jeans and his sneakers. Furthermore, he had multiple cuts on his right hand. Although [the petitioner's] theory at trial was that he cut his hand by punching a window at the vacant house, [the petitioner] told doctors at a subsequent emergency room visit that he had cut his hand with a pocketknife; [and] told officers during his interrogation that he was cut with a knife during a fight.

Id. at 659-60. The SJC concluded, "the evidence supports the conviction of murder under a theory of extreme atrocity or cruelty as well." Id. at 660.

In this court, the petitioner contends that the SJC failed to follow clearly established precedent when it rejected his argument that the evidence was insufficient to support his conviction. He advances two reasons in support of this claim. First, he claims that, because the Commonwealth presented no evidence that he stabbed the victim, it was unreasonable for the SJC to find that the evidence was sufficient to support his conviction under either a theory of felony-murder or a theory of extreme atrocity or cruelty. Second, he claims that there was insufficient evidence to find that he was a joint venturer. This gap exists because the Commonwealth needed to establish either that he had knowledge that Gallett was armed or that he was himself armed with a knife. And yet, he claims, the evidence that the Commonwealth proffered to establish the latter fact — the testimony of Valery — was insufficient and circumstantial. After all, he

notes, Valery had only known him for a few weeks and "she had only seen [him] carry a pocketknife on a few occasions in the recent past." Inasmuch as her testimony "does not support an inference that he 'always' carried a knife," no reasonable jury could have determined that he was guilty under either theory — and the SJC was unreasonable in concluding otherwise.

The district court rejected the claim that the SJC failed to follow clearly established precedent, and so do we. The SJC resolved the petitioner's sufficiency claim under the Massachusetts standard laid out in Commonwealth v. Gomes, 61 N.E.3d 441, 447 (2016). See Gallett, 119 N.E.3d at 658. Because this standard mirrors that of Jackson, we hold that the SJC's decision did not deviate from clearly established federal law. See Housen v. Gelb, 744 F.3d 221, 225 (1st Cir. 2014).

Nor do we see any foundation for the petitioner's more specific claims as to why the SJC erred when it rejected his argument that the evidence was insufficient to support his conviction. The SJC appropriately noted that, because the petitioner was convicted on a joint-venture theory, it did not need to "examine the sufficiency of the evidence separately as to principal and joint venture liability." Gallett, 119 N.E.3d at 658 (quoting Zanetti, 910 N.E.2d at 884). Instead, it was only required to inquire into "whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that

the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime." Id. (quoting Zanetti, 910 N.E.2d at 884).

With respect to the conviction under a theory of felony-murder with armed robbery as the predicate offense, the SJC only needed to find that there was sufficient evidence to prove that the petitioner "was part of a venture in which at least one of the coventurers was armed with a dangerous weapon, either applied violence to the victim's body or put the victim in fear, and took the victim's property with the intent to steal it." Id. The evidence amply demonstrated that the petitioner, Gallett, and Mathurin planned the robbery, successfully lured the victim into a vacant house with the intent to commit the robbery and — during the course of the robbery — stabbed and killed him. Even though there was no direct evidence that the petitioner was the one who stabbed the victim, there was plenty of evidence to establish that he was a joint venturer. As such, the petitioner's first argument is beside the point.

So, too, the evidence supported the finding that the petitioner was armed with a knife during the robbery. On this record, we have little difficulty concluding that the SJC was not "objectively unreasonable" in its determination. Parker, 567 U.S. at 43 (quoting Cavazos, 565 U.S. at 2). Valery's testimony underpinned this finding: in response to the question "How often

- 17 -

had you seen [the petitioner] with a knife?" she testified that "He always carried it on him." Even though the petitioner contends that testimony should be interpreted more narrowly, this argument does not move the needle. See Porter, 35 F.4th at 75 (explaining that "demanding showing" that "the state court decision 'was based on unreasonable determination of facts' . . . cannot be made when '[r]easonable minds reviewing the record might disagree' about the finding in question" (alteration in original) (quoting Brumfield, 576 U.S. at 314)). If more evidence is needed to support the finding that the petitioner was armed with a knife — though surely it is not — the SJC also pointed to the fact that the petitioner had the victim's blood on his jeans, see Gallett, 119 N.E.3d at 659, and that the petitioner had multiple cuts on his right hand, which he admitted were knife wounds when speaking with emergency room doctors, see id. at 660.

With respect to the conviction under a theory of extreme atrocity or cruelty, the SJC needed to find that there was sufficient evidence to prove that the petitioner "knowingly participated in the killing, that he intended to cause death or grievous bodily harm or engaged in an act a reasonable person would know created a plain and strong likelihood of death, and that the killing was committed with extreme atrocity or cruelty." Id. at 659. In this instance, the SJC's finding of sufficient evidence was reasonable. As we already have determined, the evidence was

- 18 -

sufficient to show that the petitioner was armed with a knife. By the same token, it was reasonable to determine that the evidence showed that the petitioner — along with Gallett and Mathurin — attacked the victim and did so with extreme atrocity or cruelty. We therefore hold that the SJC's determination that there was sufficient evidence was not unreasonable.

## B

We next consider the petitioner's claim that his Confrontation Clause rights were violated.

## 1

The Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that a defendant is deprived of this right "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," and the codefendant "does not testify and cannot be tested by cross-examination." Id. at 135-36. This violates the Constitution, the Court made clear, even if the jury receives limiting instructions to disregard such statements. See id. at 135 (explaining that "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the

- 19 -

defendant, that the practical and human limitations of the jury system cannot be ignored").

In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court clarified Bruton. It held that Bruton does not apply "when the codefendant's confession is redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted against him at trial." Id. at 202. In Bruton, the Court explained, "the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice" and "at the time that confession was introduced there was not the slightest doubt that it would prove 'powerfully incriminating.'" Id. at 208 (alteration in original) (quoting Bruton, 391 U.S. at 124 n.1, 135). By contrast, the confession in Richardson "was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." Id. Consistent with the foregoing, the Richardson Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211. Richardson's bottom line was that, whereas statements that are incriminating "only when linked to other evidence" can be cured by proper limiting instructions, "facially incriminating" statements

cannot. Id. at 209, 211; see United States v. Vega Molina, 407 F.3d 511, 520 (1st Cir. 2005) ("Statements that are incriminating only when linked to other evidence in the case do not trigger application of Bruton's preclusionary rule.").

Richardson was not the Supreme Court's last word on the scope of Bruton. In Gray v. Maryland, 523 U.S. 185 (1998), the Court recounted that "Richardson placed outside the scope of Bruton's rule those statements that incriminate inferentially." Id. at 195. But — the Gray Court stressed — "inference pure and simple cannot make the critical difference." Id. Rather, the applicability of Richardson "must depend in significant part upon the kind of, not the simple fact of, inference." Id. at 196 (emphasis in original).

The codefendant's statement at issue in Gray was a response to the question, "Who was in the group that beat Stacey[?]" Id. at 192. The redacted statement — as read to the jury — was "Me, deleted, deleted, and a few other guys." Id. at 196. When this statement appeared in the transcript, which was entered into evidence, it read "Me, , and a few other guys." Id. at 192. The Court recognized that "the jury [had to] use inference to connect . . . [this] redacted confession with the defendant." Id. at 195. Even so — and despite the fact that it was not possible to infer solely from the text of the codefendant's redacted statement to whom the word "deleted" referred — the Court held

- 21 -

that the redacted confession was facially incriminatory.  See id.
"[W]e believe," Justice Breyer wrote, that "considered as a class,
redactions that replace a proper name with an obvious blank, the
word 'delete,' a symbol, or similarly notify the jury that a name
has been deleted are similar enough to Bruton's unredacted
confessions as to warrant the same legal results."  Id.

To explain why Gray was distinguishable from Richardson,
the Court focused on the different "kind of" inference at issue in
each case.  Id. at 196 (emphasis in original).  In Richardson, the
"inferences involved statements that did not refer directly to the
defendant himself and which became incriminating 'only when linked
with evidence introduced later at trial.'"  Id. (quoting
Richardson, 481 U.S. at 208).  Gray, however, was a horse of a
different hue:  there, the inferences "involve statements that,
despite redaction, obviously refer directly to someone, often
obviously the defendant," and the jury could "ordinarily" draw
these inferences "immediately."  Id.  What is more, in Gray, "the
redacted confession with the blank prominent on its face, in
Richardson's words, 'facially incriminat[ed]' the codefendant."
Id. (emphasis in original) (quoting Richardson, 481 U.S. at 209).
As such, while Richardson lay outside the scope of Bruton, Gray
fell within its ambit.

In the last analysis,

> Gray makes clear that, even when the jury must engage in some inferential reasoning in order to conclude that a codefendant's statement is incriminating, the statement still may fall within the scope of Bruton. For the statement to do so, though, the inference that is necessary to make it incriminating must be one 'that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial,' such that the statement 'obviously' and 'directly' implicates the defendant in the crime.

United States v. de Leon-De La Rosa, 17 F.4th 175, 191 (1st Cir. 2021) (quoting Gray, 523 U.S. at 196).

**2**

Against this backdrop, we turn to the case at hand. At the trial, Gallett did not testify, but a redacted audio-video recording of his statements was played for the jury. For ease in reference, the jury was given a redacted transcript of Gallett's statements. Prior to playing the recordings, the judge informed the jury that this transcript was redacted, that they were not to speculate about the gaps or the reasons for the gaps in the transcript, and that the transcript was not evidence.

Before the SJC, the petitioner argued that the use and admission of the redacted audio-video recording of Gallett's statements and the use of the redacted transcript of his statements violated Bruton. The gaps in the recording and the blank spaces

in the transcript, he argued, directly inculpated him by inviting the jury to speculate on the identity of the redacted accomplice.

The SJC rejected this argument, holding "that there was no Bruton violation because Gallett's redacted statements did not name expressly, implicate, or obviously refer to [the petitioner] so as to be 'facially' incriminating." Gallett, 119 N.E.3d at 660 (quoting Gray, 523 U.S. at 196). The SJC offered a plethora of reasons to substantiate this conclusion: that, given that there were three people involved in the killing of the victim (Gallett, the petitioner, and Mathurin), "[i]t would not have been obvious to the jury that the blank space was specifically referring to [the petitioner]," id. at 661; that, "even if we read in specific pronouns to the transcript, a single pronoun, if not referencing a specific individual, would not raise a Bruton issue in these circumstances," id.; that the petitioner's argument that the jury was able to combine the audio-video recording and the transcript "to form the opinion that the blank spaces in the transcript referred to [the petitioner]" was a weak one, given that "[e]ven where pronouns such as 'us' and 'we' were redacted, the blank spaces that remained were in the transcripts only," id.; that the judge's limiting instructions concerning the transcript "were sufficient to obviate [the petitioner's] concern over the gaps," id.; that the "redacted statements incriminate [the petitioner] only to the extent that the jury accepted the other evidence

against [the petitioner] that places him at the scene of the crime," id.; that "the redactions from the audio-video recordings and transcripts would not lead to confusion or undue speculation," id.; and that the petitioner actually "relied on his and Gallett's statements as a critical part of his defense" and "benefited from redactions in his own statements that would have contradicted his theory on defense," id. at 662.

On appeal, the petitioner argues that the SJC erred in holding that the trial court did not violate Bruton when it allowed the jurors to read Gallett's redacted statements. In the petitioner's view, the SJC's decision was based on both an unreasonable determination of the facts and a misapplication of federal precedent. He directs our attention to a number of redacted statements, which he submits were "powerfully incriminating." These include the following:[1]

- Gallett's statement that, once the victim entered the abandoned house, he "starts like taking out the pizzas and asking [   ] to turn on the light."
- Gallett's statement that, after he hit the victim in the neck, "[   ] ended up all the way into like the first room after the kitchen, in like this room, and like [the victim] still wasn't dead."

---

[1] We have indicated where the redactions in the transcript were located with the following symbol: "[   ]".

- 25 -

- Gallett's statement that, after he, Mathurin, and the petitioner took the victim's vehicle and drove to the church, "[   ] cleaned out the car, like all the stuff in it."

- Gallett's statement that the "knife [he] used up there" is "gone," that he is "not sure" where it went, and that he "remember[s] [   ] cleaning it up."

The SJC, the petitioner posits, made an unreasonable determination of the facts when it found that these redactions were not "facially" incriminating given that they did not obviously refer to the petitioner rather than Mathurin. This was unreasonable, the petitioner says, in light of the fact that Mathurin's name appeared unredacted in other parts of the transcript. Thus, "[a]ny reasonable juror" would have deduced that "[t]he court is not hiding Mathurin's name" and any redaction must be of the petitioner's name. In any event, the SJC — as the petitioner sees it — misapplied Gray when it reasoned that there was no Bruton violation given that "Gray makes no exception merely because a blank space could refer to multiple persons." The petitioner adds that Gray itself revolved around a redaction that could have referred to multiple individuals — yet the Supreme Court found that the redacted confession violated Bruton.

We have reviewed the state court trial record with care. We conclude that the SJC's decision was based upon an unreasonable application of Gray.

Gray made clear that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble Bruton's unredacted statements that, in our view, the law must require the same result." 523 U.S. at 192. This holds true even "if the juror hears the judge's instruction not to consider the confession as evidence against [the defendant]," id. at 193, and even when "the reference might not be transparent" like when "a confession . . . uses two (or more) blanks, even though only one other defendant appears at trial," id. at 194-95. What is more, a Bruton violation occurs even when a redaction is such that "the jury must use inference to connect the statement in this redacted confession with the defendant." Id. at 195.

The redactions here fall within the class that, Gray determined, "so closely resemble[s] Bruton's unredacted statements," id. at 192, and, thus, are "facially incriminating" under Richardson, 481 U.S. at 211. This conclusion flows from the simple fact that the jury would have easily and immediately been able to infer that the redacted portions of Gallett's statements

in the transcript referred to the petitioner rather than to Mathurin.  See Gray, 523 U.S. at 196.  We explain briefly.

To begin, the redacted portions of Gallett's statements in the transcript clearly included "obvious indications of alteration."[2]  Id. at 192.  That these alterations consisted of deletions of multiples lines and passages and not just blank spaces — facts that the Commonwealth contends precludes a determination that the alterations were facially incriminating — is beside the point.  What matters is that the redactions plainly indicate that alterations have been made.  These redactions would have led the jury quite readily to infer that the deletions referred to the petitioner.  Given that it was Gallett's statement, the only other option was that the deletions referred to Mathurin.  Yet, Mathurin was not on trial.  A juror would thus have likely reasoned that the most obvious person to whom the redactions were referring to was the petitioner.  To cinch the matter, Mathurin's name appeared unredacted elsewhere in the transcript and, therefore, it would have been child's play for the jury to deduce that the redacted portions must refer to someone other than Mathurin.  The

---

[2] It is possible that the audio-visual recording of Gallett's statements did not make the deletions obvious.  Even so, the fact that the deletions in the transcript were obvious compels our conclusion that there was a Bruton violation.  And although the transcript itself was not introduced into evidence, even "a nonadmissible declaration cannot be wiped from the brains of the jurors."  Bruton, 391 U.S. at 129; see Freeman v. Superintendent Fayette SCI, 62 F.4th 789, 791 (3d Cir. 2023).

petitioner, of course, was the only remaining option.  In addition — and in contradistinction to <u>Richardson</u> — the redactions referred directly to the petitioner and were incriminating even without being "linked with evidence introduced later at trial." <u>Richardson</u>, 481 U.S. at 208.  To put it bluntly, these redactions were "facially incriminating."  <u>Id.</u> at 211.

To say more on this point would be to paint the lily. We conclude that the SJC's determination that there was no <u>Bruton</u> violation was based on "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

**4**

This conclusion does not end our inquiry.  Having found that the SJC unreasonably applied <u>Gray</u>, we next must determine whether its error resulted in "actual prejudice" and had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 631, 637.

In making this determination, our review is de novo. Importantly, the SJC did not engage in a <u>Brecht</u> analysis.  Thus — notwithstanding the deferential review mandated by AEDPA — "we can hardly defer to the state court on an issue that the state court did not address."  <u>Fortini</u> v. <u>Murphy</u>, 257 F.3d 39, 47 (1st Cir. 2001).

- 29 -

In undertaking a Brecht analysis, "[t]he burden of establishing harmlessness rests with the state qua respondent." Foxworth, 570 F.3d at 436. And if we "entertain[] 'grave doubt as to harmlessness, the petitioner must win.'" Id. (quoting O'Neal v. McAninch, 513 U.S. 432, 437 (1995)).

The Commonwealth argues that the petitioner failed to show that the Brecht hurdle was cleared for three reasons. First, it suggests that "Gallett's statements, when read as a whole, recount only his own involvement in the crimes." Although it concedes that some of Gallett's statements "could have been construed to refer to [someone] else," it insists that none of these statements "directly implicate another individual in the commission of the robbery or murder." Second, the Commonwealth suggests that there was no Brecht error because the petitioner "used Gallett's confessions to advance his [own] defense." Third, it suggests that "there was overwhelming evidence supporting petitioner's convictions" and, thus, even if Gallett's redacted statements were improperly received in evidence, they did not have a substantial and injurious effect or influence in arriving at the jury's verdict.

We start with the Commonwealth's second suggestion, which we find unpersuasive. We do not see how the petitioner's use of Gallett's statements in support of his own defense necessarily insulates those statements from the claim that they

- 30 -

had a prejudicial effect vis-à-vis the verdict.  The Commonwealth offers no persuasive authority in support of its position, and we are not aware of any.  Consequently, we reject this suggestion out of hand.

This leaves the Commonwealth's first and third suggestions.  The first suggestion — that none of the redacted statements directly implicates the petitioner in the commission of the robbery or murder — is literally correct.  None of those statements explicitly singles out the petitioner as being the one who either robbed or murdered the victim.  But to constitute a prejudicial Brecht error, the redacted statements need not directly link the petitioner to these crimes.  All that they need to do is to have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 631.  The Commonwealth's first suggestion is, therefore, a dead letter.

This brings us to the Commonwealth's final suggestion. That suggestion is built on bedrock:  there was abundant evidence for the jury to find the petitioner guilty under either a theory of felony-murder or a theory of extreme atrocity or cruelty.  But our finding that the SJC reasonably determined that there was sufficient evidence to convict the petitioner is not necessarily coterminous with the outcome of a Brecht analysis.  See, e.g., Foxworth, 570 F.3d at 436.  On this issue, we hold that the substantial evidence available obviated the possibility that

Gallett's redacted statements prejudiced the jury. Put another way, we entertain no grave doubt that the jury would have reached the same verdict even if it had not heard Gallett's redacted testimony.

Of course, Gallett's redacted statement in which he asserted that he "remember[ed] [   ] cleaning [the knife] up" was arguably different in kind from his other redacted statements. The other redacted statements placed the petitioner in the abandoned house, in the room in which the victim died, and in the victim's vehicle. One of those statements further implicated the petitioner in cleaning up blood from the vehicle. And yet — in addition to the fact that there was a substantial amount of evidence in the record that already established these connections between the petitioner and the crime scene — none of these statements linked the petitioner to the murder. By contrast, Gallett's statement describing the petitioner cleaning the knife seemingly close in time and space to the murder may have insinuated just that.

Even so, the assertion that this redacted statement prejudiced the petitioner stands on shaky ground. There was a substantial amount of other evidence in the record that already tied the petitioner to the murder. Valery's testimony established that the petitioner helped plan the heist and carried a knife on his person. The victim was stabbed repeatedly; a bent and broken

knife was found at the scene; the petitioner had the victim's blood on his clothes; and the petitioner had bleeding cuts on his hand shortly after the murder. See Gallett, 119 N.E.3d at 659-60. What is more, the petitioner himself told the doctors treating him in the emergency room that the injuries were caused by a knife. See id. In short, the petitioner was caught red-handed.

The most that the petitioner's counsel could offer to blunt the force of this evidence was to point to the petitioner's shifting stories and evidence that there was some broken glass at the scene of the murder. He then speculated that the petitioner had acquired the wounds from breaking the glass to enter the scene (contrary to what the petitioner told the doctors). The dissent conjectures that, if indeed the glass were the true source of the cuts, the petitioner may have lied to the treating physicians to conceal his presence at the scene of the crime. But if the petitioner was intent on lying, it seems implausible that — knowing that the victim had died of stab wounds — he would have volunteered that a knife was the source of the cuts. All in all, this properly admitted evidence, by itself, left little room for any doubt that the petitioner stabbed the victim. Cf. Foxworth, 570 F.3d at 436 (holding that codefendant's redacted statement both violated Bruton and constituted Brecht error when other incriminating evidence was scarce and thus it was probable that redacted statement had substantial and injurious influence on outcome).

And because the jury was given a joint venturer instruction, it was not required to pick only one murderer.

Then, too, Gallett's testimony was hardly a model of truthfulness. When it came to describing the knife, he offered wildly inconsistent testimony about who cleaned it and about who possessed it on the morning after the murder. In any event, whatever probative value Gallett's testimony might be said to have had, it was like coals to Newcastle. See Sinnott v. Duval, 139 F.3d 12, 20 (1st Cir. 1998) (finding no Brecht error in codefendant's improperly admitted testimony because that testimony "had to have fared poorly in the jury's minds").

The genius of the jury system is the ability of impartial jurors to make a common-sense appraisal of the evidence before them. The dissent's analysis posits a jury made up of remarkably gullible individuals. We think that almost any real-life jury would find guilt after taking into account the petitioner's role in planning a crime that would be easy to investigate if a live victim was left behind, the blood on the petitioner's clothes, his ownership of a knife, the cuts on his hands, his admission to the emergency room doctors, and his flimsy theory for why that admission was supposedly a lie. Viewed in light of the totality of the evidence in this case, we conclude that Gallett's statements did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 631. It

follows inexorably that the SJC's application of Gray, though mistaken, does not warrant habeas relief.

C

The petitioner next argues that the SJC misapplied clearly established precedent when it held that the trial court committed only harmless error in refusing to allow him to cross-examine the Commonwealth's medical examiner about the location of the wounds on his hands. We set the stage.

During the trial, the petitioner attempted to cross-examine the medical examiner about wounds on his right hand. After a detective testified that the petitioner had cuts on "the meaty side on the back of [his] right hand," "a laceration type injury on the heel near his wrist," and "on the knuckle," the petitioner's counsel asked the medical examiner, "If a person were wielding a knife and injured themselves on the knife that they were wielding, you would expect to see injuries to the interior of their palm; is that fair to say?" The Commonwealth objected, and the judge sustained the objection. At sidebar, the judge held firm, stating that she did not "think this witness [was] qualified to talk about the possible wounds that might be inflicted on knife wielders."

The petitioner argued that the judge violated his confrontation rights by limiting his cross-examination of the medical examiner. The SJC acknowledged that "the judge should have permitted [the petitioner] to cross-examine the medical

- 35 -

examiner about theoretical wounds on [the petitioner's] hand," but determined that the petitioner was "unable . . . to demonstrate that he was prejudiced by the judge's ruling." Gallett, 119 N.E.3d at 665. In support, the SJC explained that, "the judge did not completely bar [the petitioner] from cross-examining the medical examiner about knife wounds," inviting the petitioner to present expert testimony about the cut to his hand if it was relevant. Id. The petitioner never did so. Moreover, the petitioner was allowed to present other evidence to demonstrate that he did not wield a knife. Id.

The petitioner suggests that the SJC's decision was a misapplication of the Supreme Court's holding in Delaware v. Van Arsdall, 475 U.S. 673 (1986).[3] He insists that a proper analysis of Van Arsdall requires a finding that he was prejudiced by the trial court's limitation on his cross-examination of the medical examiner.

This suggestion does not move the needle. Van Arsdall is not on point. The issue before the Van Arsdall Court was whether a trial court's denial of a defendant's ability to engage in an "otherwise appropriate cross-examination designed to show a

_____

[3] Although the SJC did not cite Van Arsdall, we find this omission inconsequential. See Zuluaga v. Spencer, 585 F.3d 27, 31 (1st Cir. 2009) ("[I]t would elevate form over substance to impose some sort of requirement that busy state judges provide case citations to federal law (or corresponding state law) before federal courts will give deference to state court reasoning.").

prototypical form of bias on the part of the witness" constituted a violation of the Confrontation Clause.  Id. at 680.  To be specific, the inquiry concerned whether a limitation on a defendant's ability to cross-examine a witness in order to impeach the witness prejudiced the defendant.  See Brown v. Ruane, 630 F.3d 62, 70 (1st Cir. 2011) ("The Supreme Court's application of Van Arsdall has always involved evaluation of restrictions on cross-examination intended to impeach the credibility of the witness being examined.").  Here, by contrast, the limitation on the cross-examination had nothing to do with impeaching or questioning the credibility of the medical examiner.  Because Van Arsdall's prejudice analysis is inapposite, we do not see how the SJC's holding can be deemed to be "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[T]his Court has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.").

We add, moreover, that the petitioner's claim that the SJC unreasonably applied federal precedent fails to withstand scrutiny when analyzed in light of relevant Supreme Court precedent.  "Whether rooted directly in the Due Process Clause of

- 37 -

the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). As part of this meaningful opportunity, defendants enjoy the right to confront and cross-examine witnesses, see Chambers v. Mississippi, 410 U.S. 284, 295 (1973), and "elicit exculpatory defense evidence through cross-examination," Brown, 630 F.3d at 72. But this right "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers, 410 U.S. at 295. Withal, "[t]his right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006) (second alteration in original) (internal quotation marks omitted) (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)). Infringements on this right to present a complete defense are subject to a harmless-error standard. See Crane, 476 U.S. at 691.

Given this legal landscape, we cannot say that the SJC's ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States." 28 U.S.C. § 2254(d)(1). As the SJC explained, even though the trial court erred, the petitioner was wholly unable to demonstrate that he was prejudiced by this error. See Gallett, 119 N.E.3d at 665. The petitioner was given ample opportunity to present his defense, including a chance to present his own expert testimony regarding the cut to his hand. See id. That he never sought to call such a witness does not render the trial court's error prejudicial. We therefore conclude that the SJC's ruling did not involve an unreasonable application of Supreme Court precedent.

**D**

The petitioner next argues that the SJC's finding of no error in the trial court's failure to provide various jury instructions departed from clearly established precedent and was based on an unreasonable determination of the facts. At issue is the trial court's failure to provide (1) a supplemental instruction regarding armed robbery, (2) a lesser included offense instruction for use of a motor vehicle without authority, and (3) a humane practice instruction. We consider these matters sequentially.[4]

---

[4] The Commonwealth argues that the petitioner's first two claims of instructional error are unexhausted given that the constitutional objections pressed by the petitioner were not made in the state court. We do not agree: we believe that there are grounds for finding that his claim of prejudice was "functionally identical to a federal-law claim" of a due process violation and that he has exhausted any such claim. Scarpa v. Dubois, 38 F.3d 1, 7 (1st Cir. 1994); see Coningford v. Rhode Island, 640 F.3d

- 39 -

At trial, the petitioner requested "that the judge instruct the jur[ors] that they 'must find that the required intent to steal coincided with the use of force' to find him guilty of armed robbery and felony-murder.  The judge declined to give the instruction, stating:  'I think it's inappropriate based on the state of [the] evidence . . . .'"  Id. at 662 (second alteration in original).  The SJC affirmed the trial court's refusal.  See id. at 663.   In the SJC's estimation, the trial court's instructions regarding felony-murder with robbery serving as the predicate offense "as a whole, sufficiently explained to the jury that the Commonwealth was required to prove the defendant harbored an intent to steal at the same time he used force."  Id. at 662. The SJC explained that the trial court's instructions to the jury — "that '[t]he actual force and violence must be the cause of the defendant obtaining possession of the property,' and that 'the Commonwealth must prove that the defendant took and carried away the property against the alleged victim's will with the intent to deprive the alleged victim of his possessions permanently'" — were "located mere lines apart in the transcript."  Id. (alteration in original).  Owing to the fact that the instruction on felony-murder similarly conveyed that the Commonwealth had to prove that

478, 482-83 (1st Cir. 2011).  Accordingly, we consider his argument on the merits.

"the killing occurred in connection with the felony, and at substantially the same time and place" — the SJC found no error. Id. at 663.

The petitioner invites us to hold that the SJC's decision was based on an unreasonable application of facts. He contends that the SJC did not appreciate the fact that the trial court's instructions failed adequately to convey that armed robbery requires that the intent to steal coincide with the act of force.

We decline this invitation. Nothing in the SJC's conclusions was unreasonable in light of the facts. Among other things, it reasonably concluded that the instructions — taken as a whole — properly explained that the intent to steal must coincide with the act of force.

So, too, we decline to hold the SJC's decision to be contrary to and an unreasonable application of clearly established federal precedent. The petitioner asserts that the SJC flouted the statement in Mathews v. United States, 485 U.S. 58, 63 (1988), that "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." We do not agree. Mathews concerned an entrapment defense and, as we have explained, "the Supreme Court has never applied the language in Mathews relied on by petitioner in any other case, nor to any defense other than the entrapment defense at stake in

- 41 -

Mathews." Hardy v. Maloney, 909 F.3d 494, 500 (1st Cir. 2018).
At any rate, this excerpt "from Mathews is dicta, not a holding,
and we do not set aside state court rulings on habeas review for
being at odds with Supreme Court dicta." Id. We therefore
conclude that the SJC's decision was not contrary to or an
unreasonable application of clearly established federal
precedent.[5]

**2**

At trial, the petitioner requested that the jury be
instructed on the use of a motor vehicle without authority as a
lesser included offense of armed robbery. "The judge declined to
give the instruction because she thought it was 'highly
inappropriate when [there were] four alternative items that are
alleged to have been stolen' and that the instruction did not fit
with 'the facts and circumstances of this case.'" Gallett, 119
N.E.3d at 663 (alteration in original). The SJC affirmed this

_____

[5] The petitioner also relies on the decision in Stevenson v. United States, 162 U.S. 313 (1896), and on this court's decision in United States v. Gamache, 156 F.3d 1 (1st Cir. 1998), as supporting his claim that the SJC's decision was contrary to and an unreasonable application of clearly established federal precedent. Inasmuch as neither of these cases speaks to whether a requested instruction may be denied on the ground that other instructions cover the requested one in substance — which was the basis given by the SJC for denying the petitioner's requested supplemental instruction here — we have little difficulty in concluding that they do not render the SJC's decision contrary to or an unreasonable application of clearly established federal precedent.

- 42 -

decision, concluding that "the evidence did not warrant a finding of the lesser included offense of use of a motor vehicle without authority." Id. In addition to pointing to the fact that "[t]he elements differentiating the two crimes were not sufficiently in dispute so that the jury could consistently find the defendant innocent of the greater and guilty of the lesser included offense," the SJC commented that there was not even sufficient dispute that the petitioner intended to permanently deprive the victim of his vehicle. Id. Given that the indictment alleged that the petitioner stole more than just the victim's vehicle, the SJC concluded that "[i]t would have been inappropriate to give the lesser included instruction where the evidence and circumstances of the case did not support it." Id. at 664.

The petitioner argues that the SJC's decision was based on an unreasonable determination of the facts. Whereas the SJC determined that a jury could not rationally have found that the petitioner did not intend to permanently deprive the victim of his vehicle, the petitioner contends that a jury could have rationally found that he did not know that the victim was dead, that he was already leaving the abandoned house when Gallett gave him the keys, and that he drove the vehicle a short distance to a church parking lot and abandoned it there. From these facts, he suggests a rational jury could have found this incident to be "more like joyriding than armed robbery."

This suggestion is unconvincing.  First, the evidence showed that the petitioner drove the victim's vehicle to the back of the church parking lot, removed the pizzeria sign that had previously been atop it, cleaned the vehicle with bleach and rubbing alcohol, and proceeded to abandon it.  These actions, as the SJC reasonably noted, indicated that the petitioner intended to deprive the victim of the vehicle permanently.  See id. at 659, 663.  What is more, the evidence showed that the petitioner stole more than just the vehicle from the victim.  See id.  There was, therefore, nothing unreasonable about the SJC's determination that the trial judge did not err in refusing to give the jury the lesser included offense instruction.

**3**

We reach a similar conclusion with respect to the petitioner's argument regarding the trial court's failure to provide a humane practice instruction.  At trial, the petitioner requested such an instruction.  See id. at 666. Although conceding that he "didn't raise [voluntariness] as an issue in the trial," the petitioner argued that he did not do so specifically because he believed that the video of his interrogation — in which he implicated himself in the crime — "spoke for itself, and [he] didn't need to ask more questions about it."  Id. at 667 (alterations in original).  The trial judge declined this request,

finding that the petitioner "chose not to make the voluntariness of [his] statement[] a live issue at trial." Id. at 666.

The SJC affirmed this decision. "[T]he settled law in the Commonwealth is that 'if the voluntariness of the defendant's statements remains a live issue at trial, the judge must submit the issue of voluntariness to the jury.'" Id. at 668 (quoting Commonwealth v. Sunahara, 920 N.E.2d 831, 834 (2010)). But "[t]o be considered a live issue, 'substantial evidence of involuntariness [must be] produced.'" Id. (second alteration in original) (quoting Commonwealth v. Kirwan, 860 N.E.2d 931, 942 (2007)). Here, however, "the issue of voluntariness was insufficiently raised to require the judge to give a humane practice instruction." Id. In support, the SJC noted that the petitioner not only conceded that he did not raise voluntariness as an issue but also employed a theory of defense — that he neither participated in the victim's murder or robbery nor that he had the requisite intent — that "did not require a humane practice instruction" given that "his argument to the jury was that his interrogation statements were evidence that he was not culpable for the murder." Id. at 669.

The petitioner argues that the SJC's decision denied him his "right to due process secured by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and

- 45 -

violated Supreme Court precedent" and was based on an unreasonable determination of the facts. Not so.

In support of his first claim, the petitioner again relies on Mathews, 485 U.S. at 63. Yet — as explained above — Mathews does not constitute clearly established federal precedent outside the context of entrapment. And to the extent that the petitioner argues that the failure to give a humane practice instruction constituted an independent due process violation, his argument falls flat. As the SJC explained, such an instruction is required (as a matter of state law) only "if the voluntariness of the defendant's statements remains a live issue at trial" and "'substantial evidence' of involuntariness was produced." Gallett, 119 N.E.3d 668 (quoting Kirwan, 860 N.E.2d at 942). Since the SJC reasonably concluded that the facts of the case did not render voluntariness a live issue, we have little difficulty in concluding that its determination regarding the refusal to grant a humane practice instruction was not unreasonable. And given that the facts amply demonstrate that voluntariness was not a live issue, we conclude that the SJC's decision was not based on an unreasonable determination of the facts.

To sum up, we hold that none of the SJC's rulings concerning the petitioner's claims of instructional error constitute grounds for federal habeas relief.

**E**

The petitioner's final plaint stems from the trial court's statement to the jury on September 11, 2014, in which it acknowledged the anniversary of September 11, 2001. Before the SJC, the petitioner argued that the trial court's statement prejudiced him. The SJC demurred, finding no prejudicial error. See id. at 664. In this court, the petitioner asserts that the SJC's decision was contrary to and an unreasonable application of clearly established federal precedent.

As the SJC observed, the trial judge addressed the jury to acknowledge the anniversary of September 11, 2001. See id. The judge told the jury that, on September 11, 2001, she had presided over a trial and was forced to evacuate the courthouse that day. Still, she was moved when the jurors in the 2001 case "all voted unanimously to come back the very next day." Id. After relaying this story to the jury she had empaneled, the judge stated,

> I just wanted to share that story with you because I'm sure you'll appreciate you're part of the government here, and the government did go on and has continued to go on and you are the government here. So I wanted to share that story with you and hope you further appreciate your vital role in our justice system here in the Commonwealth of Massachusetts and the United States of America.

Id.

In finding that this statement did not prejudice the petitioner, the SJC explained that, although it was "mindful that the 'effect on the jury of whatever a judge says or does may be significant,'" id. (quoting Commonwealth v. Fitzgerald, 406 N.E.2d 389, 395 (1980)), in this instance there was no prejudice because "the judge's remarks were made to emphasize the importance of jury duty. Her reference that the jury were part of the government was cursory and nonprejudicial." Id. The SJC added that "because the judge's remarks were neither intemperate nor critical of the attorneys, there was no danger that the judge exhibited to the jury a bias against the defendant." Id. (quoting Commonwealth v. Mello, 649 N.E.2d 1106, 1118 (1995)).

The petitioner complains that the SJC's holding violated his due process and fair trial rights, including his right to a fair trial. In support, he cites to Gray v. Mississippi, 481 U.S. 648, 667 (1987), asserting that Gray establishes that "an impartial jury is so basic to a fair trial that its infraction can never be treated as harmless."

This complaint lacks force. Although the Gray Court recognized that the right to an "impartial adjudicator, be it judge or jury," is "'so basic to a fair trial that [its] infraction can never be treated as harmless error,'" the facts of that case render it inapposite here. Id. at 668 (quoting Chapman v. California, 386 U.S. 18, 23 (1967)). Gray concerned whether the impermissible

exclusion of a prospective juror in a capital case could be subject to harmless error review. See id. at 651. Because nothing resembling such an issue arises in the case at hand, we find Gray to be of little relevance. On the facts here, we hold that the SJC reasonably concluded that the judge's remarks — when read in context — were merely intended to emphasize the importance of jury duty. Consequently, the SJC was not unreasonable when it held that the trial court's remark "was cursory and nonprejudicial." Gallett, 119 N.E.3d at 664.

## III

We need go no further. We hold that the SJC's decision affirming the petitioner's conviction was neither contrary to clearly established federal law nor did it involve an unreasonable application of clearly established federal law. Similarly, we hold that the SJC's decision did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the trial court. It follows that the district court did not err in declining to issue a writ of habeas corpus.

For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>**.


—Dissenting Opinion Follows—

**BARRON**, <u>Chief Judge</u>, **concurring in part and dissenting in part**.  Michel St. Jean is serving a life sentence in a Massachusetts state prison for his state law convictions for felony murder and murder in the first-degree by reason of extreme atrocity or cruelty.  He petitions for federal habeas relief based, in part, on the use of a confession by his co-defendant, Alexander Gallett, at his Massachusetts state court criminal trial on the underlying charges.[6]  St. Jean contends that under <u>Bruton</u> v. <u>United States</u>, 391 U.S. 123 (1968), and precedents applying it, his federal constitutional right as a criminal defendant to "be confronted with the witnesses against him," U.S. Const. amend. VI, was violated by the Commonwealth's use of Gallett's confession at trial.  The Supreme Judicial Court of Massachusetts (SJC) held that there was no Sixth Amendment violation.  <u>See</u> <u>Commonwealth</u> v. <u>Gallett</u>, 119 N.E.3d 646, 661 (Mass. 2019).

The majority agrees with St. Jean, as do I, that, because of the reasons that the SJC gave for its Sixth Amendment ruling, we need not defer to it.  The majority also agrees with St. Jean, as do I, that, reviewing de novo, the Commonwealth's use of Gallett's confession at St. Jean's criminal trial violated the Sixth Amendment because, by providing an eyewitness narration of St. Jean's conduct on the night of the crimes, it inculpated him

---

[6] St. Jean also seeks habeas relief on other grounds, that, like the majority, I conclude are without merit.

- 51 -

directly in the charged offenses.  The majority nonetheless declines to grant St. Jean's petition, because the majority concludes that under <u>Brecht</u> v. <u>Abrahamson</u>, 507 U.S. 619 (1993), St. Jean did not suffer the kind of prejudice from the Sixth Amendment violation that would entitle him to habeas relief.  I cannot agree.

As I will explain, in light of the defense theory that St. Jean pressed at his trial, the record fails to reveal a strong enough case against him to remove "grave doubt" that Gallett's statement influenced the jury's decision to render a guilty verdict.  <u>Foxworth</u> v. <u>St. Amand</u>, 570 F.3d 414, 436 (1st Cir. 2009) (quoting <u>O'Neal</u> v. <u>McAninch</u>, 513 U.S. 423, 437 (1995)).  Indeed, the record shows that, after the close of evidence, the Commonwealth made the case to the trial judge that a jury could find a fact that was plainly critical to the prosecution -- namely, that at all the relevant times St. Jean had possession of a knife -- by invoking the eyewitness account that Gallett gave in his confession rather than the wholly circumstantial body of evidence that the majority considers so compelling.  I would therefore grant the petition and so, respectfully, dissent, as I see no basis for our confidently discounting the influence of the confession in conducting federal habeas review when the Commonwealth itself had deemed that statement a difference-maker in state court.

I begin by briefly recapping what happened in the Massachusetts courts. I then explain why we must proceed on the understanding that the use of the Gallett statement at trial violated St. Jean's Sixth Amendment confrontation right, notwithstanding the SJC's contrary ruling. Finally, I explain why Brecht is satisfied.

The Commonwealth potentially had a powerful card to play in its case against Gallett: the confession he gave to police that he had robbed and stabbed Richel Nova. Gallett did more than describe his own conduct in giving the police his confession to those crimes, however. He also described what his accomplices had done in relation to them. And, in doing so, he thereby also incriminated St. Jean as well as a third person, Yamiley Mathurin.

As a result, the confession posed a potential problem for the Commonwealth under Bruton, because the Commonwealth was planning to try St. Jean and Mathurin alongside Gallett on the theory that all three had participated in the crimes that, ultimately, resulted in Nova's death. After all, in Bruton, the Supreme Court held that a defendant is deprived of the Sixth Amendment confrontation right when "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before

the jury in a joint trial" and the "alleged accomplice . . . does not testify and cannot be tested by cross-examination." 391 U.S. at 135-36. Indeed, in such cases, Bruton held, even limiting instructions cannot mitigate the Sixth Amendment problem. Id. at 137. The Court explained that although we generally assume jurors follow a trial judge's instructions not to consider certain evidence, "the risk that a jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant" when it comes to the untested accusations of a co-defendant, "that the practical and human limitations of the jury system cannot be ignored." Id. at 135.

The Commonwealth proposed to the trial judge what appears to have been a workaround. Rather than provide the jury with Gallett's statement as-is, the Commonwealth would remove from it all references to St. Jean and Mathurin, including in some instances by redacting a single word where a reference to St. Jean otherwise would have appeared.

The trial judge permitted the use of the sanitized version of the statement and that was how it appeared when introduced at trial. Even in its cleaned up form, however, the statement referred to at least one -- now unnamed -- accomplice and placed that accomplice with Nova in the room where Nova was found dead; described the accomplice cleaning a knife after the stabbing and cleaning "all the blood"; described the accomplice

leaving the house with Gallett when they were "done"; and described the accomplice taking Nova's car, driving it away, cleaning it out, and then abandoning it.

Moreover, by that time, Mathurin had pleaded guilty to certain charges related to the alleged events. That left only Gallett and St. Jean to be tried together, with the Commonwealth contending at their joint trial that the two were joint venturers who each had stabbed Nova.[7]

Accordingly, on direct appeal, St. Jean raised a Sixth Amendment claim under Bruton and Gray v. Maryland, 523 U.S. 185 (1998), arguing that the blanks that appeared in the cleaned-up version of Gallett's confession were as good as references to St. Jean by name. The SJC did not agree. It rejected the challenge on the ground that, as revised, the statement did not "'facially' incriminat[e]" St. Jean and, for that reason, posed no constitutional concern. Gallett, 119 N.E.3d at 660 (quoting Gray, 523 U.S. at 196). This was so, the SJC explained, because, as Mathurin had also been involved in the events that pertained to the charged crimes, the jury would not necessarily have understood the statement's various blank spaces to refer specifically to St.

---

[7] In laying out its joint venture theory at trial, there was no contention by the Commonwealth that anyone other than Gallett and St. Jean had been involved in the stabbing.

- 55 -

Jean, even though, by the time of the trial, Mathurin was no longer a co-defendant; only Gallett and St. Jean were.  Id. at 660-61.

St. Jean then filed this habeas petition in the United States District Court for the District of Massachusetts.  Because St. Jean's petition follows an adjudication by Massachusetts's highest court, relief is only proper, given the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in 28 U.S.C. § 2254), if the state-court determination of St. Jean's Sixth Amendment claim was "'contrary to,' or . . . involved, 'an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  Foxworth, 570 F.3d at 424 (quoting 28 U.S.C. § 2254(d)(1)).  In rejecting St. Jean's Sixth Amendment claim, the District Court concluded that the SJC's ruling was "both reasonable and consistent with Bruton."

**B.**

I cannot agree that the SJC's ruling reasonably applied the controlling precedents of the Supreme Court of the United States, given the Supreme Court's post-Bruton decision in Gray v. Maryland, 523 U.S. 185 (1998).  There, the Court addressed the admission at a joint criminal trial of a redacted confession by one of the co-defendants, Anthony Bell.  Id. at 188.  In the course of giving his confession, Bell had answered the question posed by law enforcement, "Who was in the group that beat Stacey[?]" with

the phrase (as it appeared to the jury), "Me,   ,   and a few other guys."  Id. at 192.  The police witness who introduced Bell's confession at the joint trial read out Bell's answer as "Me, deleted, deleted, and a few other guys."  Id. at 196.  The other defendant being tried along with Bell, Kevin Gray, contended that his Sixth Amendment right to confrontation under Bruton had been violated by the state's use of Bell's redacted statement at the joint trial with him.  Id. at 188.  The Supreme Court agreed with Gray.  Id.

The Court acknowledged that an earlier case had placed outside of Bruton's scope statements of a co-defendant that merely incriminate the non-confessing defendant "inferentially."  Id. at 195 (citing Richardson v. Marsh, 481 U.S. 200, 208 (1987)).  But the Court explained that "inference pure and simple cannot make the critical difference"; rather, the application of Bruton "depend[s] in significant part upon the kind of, not the simple fact of, inference."  Id. at 196 (emphasis in original).  The Court went on to hold that that statements of a co-defendant that are redacted to "replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted" are, "as a class," so similar to Bruton's unredacted confession that they "warrant the same legal results."  Id. at 195.

Notably, Gray acknowledged that "in some instances the person to whom [a] blank refers may not be clear" -- for instance, when the "trial indicates that there are more participants [in the crime] than the confession has named." Id. at 194-95. But, the Court reasoned, the fact that an "obvious blank" may refer to one of multiple people does not alter the underlying risk that a jury will "realize that the [redacted] confession refers specifically to the defendant" and will consider it against him. Id. at 193, 195. Faced with a confession that "obviously refers directly to someone," the Court observed, a juror "need only lift his eyes to [the defendant], sitting at counsel table, to find what will seem the obvious answer" as to the identity of the redacted referent. Id. at 193, 196.

Based on Gray, I am convinced that the SJC unreasonably applied controlling and clearly established Supreme Court precedent. See Harrington v. Richter, 562 U.S. 86, 101 (2011). The SJC concluded that there was no Sixth Amendment violation solely because, in its view, the "blank spaces in the transcript . . . easily could have been references to Mathurin" and it therefore "would not have been obvious to the jury" that the blank spaces referred to St. Jean. Gallett, 119 N.E.3d at 660-61. But Gray was unequivocal in stating that, "as a class," confessions that replace a name with an "obvious blank" fall within

Bruton's scope, and so violate the Sixth Amendment, even if it is not "transparent" to whom the blank refers.[8]  523 U.S. at 195.

This clear holding easily reaches Gallett's redacted confession, which likewise replaced references to a named accomplice with "obvious blank[s]."[9]  Id.  It thus clearly follows that Mathurin's role in the events that led to Nova's death does not make the use of Gallett's statement at St. Jean's trial compatible with the Sixth Amendment.[10]  To the contrary, for a

---

[8] In providing an illustration of how redacted statements might still obviously refer to the defendant, the Court in Gray gave as an example a straightforward confession naming a single accomplice.  The Court explained that, in those circumstances, a "sophisticated juror" might wonder how the statement could refer to anyone but the defendant, if the prosecutor has been arguing that the statement is reliable, and that the defendant, "not someone else, helped [the co-defendant] commit the crime."  523 U.S. at 193.  It would misread the clear import of Gray, however, to conclude from this example that a statement falls outside Bruton's scope whenever "someone else" -- other than the defendant -- is also implicated in the crime.  This is clear from the face of the decision, which was unambiguous in holding that an "obvious[ly]" redacted statement is barred by Bruton even when "trial indicates that there are more participants [in the crime] than the confession has named."  Id. at 195.

[9] The audio-visual recording of Gallett's confession is not in the record before us, so I cannot determine whether the deletions in the recording were obvious.  However, the written transcript that was handed to the jurors in binders "simply replaced the nonconfessing defendant's name with . . . an obvious blank."  Gray, 523 U.S. at 192.  So, although the transcript itself was not evidence, "a nonadmissible declaration cannot be wiped from the brains of the jurors" and can still violate a defendant's Sixth Amendment rights.  Bruton, 391 U.S. at 129 (quoting Delli Paoli v. United States, 352 U.S. 232, 247 (1957) (Frankfurter, J., dissenting)).

[10] That different blanks throughout Gallett's statement might, in fact, have variably referred to both St. Jean and Mathurin

- 59 -

juror left wondering who the deletions referred to, St. Jean remained the most "obvious answer."[11]  Id. at 193.  As St. Jean explains, Mathurin was not herself on trial, her name appeared unredacted in the transcript of his police interview, and the government's own theory of the case was that St. Jean, and not Mathurin, participated with Gallett in Nova's slaying.

Although we cannot defer to the SJC's ruling, we still must decide, reviewing de novo, whether St. Jean's Sixth Amendment claim has merit.  Lynch v. Ficco, 438 F.3d 35, 44 (1st Cir. 2006).  It is clear to me that, under Gray, the claim does.

---

likewise does not suffice to take Gallett's statements outside Bruton's ambit.  Gray, after all, contemplated the same legal result obtaining even when a confession "uses two (or more) blanks, even though only one other defendant appears at trial."  523 U.S. at 195.  For that matter, redactions in cases like this one can exacerbate the Bruton problem by "encouraging the jury to speculate about the [redacted] reference," and thereby "overemphasiz[ing] the importance of the confession's accusation."  Id. at 193.

[11] Because the SJC unreasonably determined that, under Gray, a jury would not have concluded that the blanks in Gallett's statement referred to St. Jean, it reasoned that the statement therefore only "implicate[d] [St. Jean] circumstantially when combined with other evidence" that "place[d] him at the scene of the crime."  Commonwealth v. Gallett, 119 N.E.3d 646, 661 (Mass. 2019).  As I have explained, however, Gray precludes the conclusion that an obviously redacted confession is not "directly accusatory" of the defendant just because it is redacted.  523 U.S. at 194. And this case is not one in which the statement "omit[ted] all indication that anyone [else]" had "participated in the crime," and so could not incriminate the defendant absent other evidence in the case.  Id. at 191 (quoting Richardson v. Marsh, 481 U.S. 200, 203 (1987)) (emphasis in original).

There cannot be any question that Gallett's redacted statement was inculpatory if understood to refer to St. Jean.[12] See Gallett, 119 N.E.3d at 660-661.  That being so, Gray requires the conclusion that the use of the statement violated St. Jean's Sixth Amendment confrontation right.

## C.

I turn, then, to the final step in the analysis, which concerns whether the Sixth Amendment violation caused St. Jean "actual prejudice."  Brecht, 507 U.S. at 637 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).  I conclude that the violation did.

---

[12] We have often noted that Bruton proscribes the use of a co-defendant's confession when that confession "powerfully incriminat[es]" the defendant.  See, e.g., United States v. Rodriguez-Duran, 507 F.3d 749, 769 (1st Cir. 2007) (citation omitted); Foxworth v. St. Amand, 570 F.3d 414, 433 (1st Cir. 2009) (citation omitted).  Neither this Court, nor the Supreme Court, however, has ever treated as a distinct requirement that a statement that otherwise "directly implicate[s]" the defendant do so powerfully.  See Samia v. United States, 599 U.S. 635, 648 (2023) (noting that Bruton cases distinguish between "confessions that directly implicate a defendant and those that do so indirectly").  To the contrary, Bruton and its progeny rest on the assumption that a co-defendant's accusation is, by its nature, powerfully incriminating.  See Gray, 523 U.S. at 194.  I therefore do not understand our precedent to require an additional inquiry into just how incriminating a confession is when it is sufficiently clear from the face of the confession that it refers to the defendant and that it implicates him in criminal activity.  See United States v. Vega Molina, 407 F.3d 511, 520 (1st Cir. 2005) (a statement is "powerfully incriminating" when it is "inculpatory on its face").

- 61 -

**1.**

The Brecht prejudice standard is demanding. It requires that the federal constitutional violation "had a substantial and injurious effect or influence in determining the jury's verdict." Id. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

At the same time, the focus under Brecht is not on whether the jury was "right in their judgment," but on "what effect the error had or reasonably may be taken to have had upon the jury's decision." Kotteakos, 328 U.S. at 764; see also Sinnott v. Duval, 139 F.3d 12, 15 (1st Cir. 1998) (explaining that Brecht, 507 U.S. at 637, adopted the harmless error standard from Kotteakos, 328 U.S. at 776). In applying Brecht, therefore, we must keep in mind that we are not evaluating the record to see if the evidence suffices to uphold the convictions, which is a task that requires us to review the evidence "in the light most flattering to the prosecution" while making "all reasonable inferences favorable to it[s] [case]." Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008) (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)). Instead, under Brecht, we are assessing whether "the properly admitted evidence [was] so strong that it overwhelmed the impact of the erroneously admitted evidence." Levasseur v. Pepe, 70 F.3d 187, 198 (1st Cir. 1995) (emphasis added). For that reason, we must take care not to view

- 62 -

the prosecution's evidence in isolation.  We instead must consider the strength of it in relation to the defense that the defendant offered.  Id.

Moreover, Brecht requires only that there be a "probability" that the offending evidence influenced the verdict, Sinnott, 139 F.3d at 15 (quoting Gilday v. Callahan, 59 F.3d 257, 269 (1st Cir. 1995)), and that probability can exist even if it is not "more likely than not" that the evidence at issue altered the outcome of the trial.  See Kyles v. Whitley, 514 U.S. 419, 434-36 (1995).  Put otherwise, relief may not be denied "simply because [the] reviewing court fe[els] that [the] petitioner 'would have been convicted even if the constitutional error had not taken place.'"  Sinnott, 139 F.3d at 15 (quoting Brecht, 507 U.S. at 642 (Stevens, J., concurring)); see also Kotteakos, 328 U.S. at 765 (explaining that an error can be prejudicial even if the remaining evidence is "enough to support" a conviction).  The habeas court must have "the conviction . . . that the error did not influence the jury, or had but very slight effect."  Sinnott, 139 F.3d at 15 (emphasis added) (quoting Kotteakos, 328 U.S. at 764); see also Kotteakos, 328 U.S. at 765 (an error is prejudicial if "one cannot say, with fair assurance," that it did not have a "substantial influence" on the judgment).  If there is "grave doubt" as to whether there was such influence, moreover, Brecht is satisfied.  Foxworth, 570 F.3d at 436 (quoting McAninch, 513 U.S. at 437).

The majority concludes that the Brecht standard has not been met here because there was a "substantial amount of other evidence in the record" that "linked [St. Jean] to the knife and the murder." The majority concludes that, in consequence, the jury would "in all probability have reached the same verdict" even absent the offending evidence. In fact, the majority suggests, only the most "gullible" of juries would have been given pause by St. Jean's defense. But, while the evidence the majority describes may be enough to show that there was sufficient evidence to warrant a conviction of the charged offenses, I do not see how that evidence was "overwhelm[ing]" enough to relieve us of "grave doubt" as to whether Gallett's statement influenced the jury, when we consider that evidence in light of St. Jean's defense. Levasseur, 70 F.3d at 198; Foxworth, 570 F.3d at 436 (quoting McAninch, 513 U.S. at 437).

**a.**

True, as the majority points out, the record shows that there was some of the victim's blood on St. Jean's clothes. But, given the charges against St. Jean and the Commonwealth's theory of his guilt, this evidence on its own hardly makes an overwhelming case for the prosecution.

The Commonwealth's theory of St. Jean's guilt was, in significant part, that, in addition to Gallett, St. Jean himself

had stabbed Nova. The Commonwealth even framed its closing argument around that theory of St. Jean's guilt. St. Jean, however, in articulating his defense, did not dispute that he had been at the house where the slaying occurred. And the Commonwealth's own witness testified to the presence of blood throughout that apartment. See Levasseur, 70 F.3d at 198 (evaluating prejudice through "comparing the prosecution's case to [the asserted] defense" (emphasis added)). Thus, while the blood evidence certainly tied St. Jean to the scene of the stabbing, it did not thereby contradict the theory of what had transpired that St. Jean was pressing.

The majority also emphasizes that the record shows both that Nova was stabbed repeatedly and that the knife found at the scene of the crime was bent and broken. Here, too, the evidence does little to dispel a grave doubt about the influence of the Gallett statement on the jury, given the nature of St. Jean's defense. In countering the Commonwealth's case, St. Jean did not deny that Gallett had stabbed Nova. It is therefore significant that the medical examiner testified that he could not say whether more than one knife had been used or whether there had been more than one assailant.

The majority points as well to the cuts on St. Jean's hand that were seen by police soon after the slaying, in addition to the statements St. Jean made to the emergency room doctor that

those injuries were caused by a knife.  St. Jean, however, did not dispute that he had told both the emergency room doctor and his cousin that he had been injured in a fight in the street.  Nor did St. Jean dispute that he had told the doctor that his injury had come from a knife.  In other words, in asserting in his defense that there was no evidence that sufficed to show that he had a knife on the night of the stabbing, St. Jean did not deny saying what other evidence showed he had said about his hand having been cut by a knife.  Instead, his defense counsel contended only that St. Jean, understandably, made up an excuse for the injury to his hand, because he had not wanted to tell the truth -- that he had cut his hand by breaking glass to enter an abandoned house where a man was later stabbed to death in his presence.

Consistent with that explanation, St. Jean's defense proceeded as follows.  Although St. Jean initially told police the same false story that he told his cousin and the emergency room doctor, he ultimately admitted in that same interview with the police that he had been at the empty house when the stabbing occurred and that he had acquired the cuts on his hand from breaking glass on the backdoor of that house.  And, at trial, St. Jean pointed to evidence in the record that showed that the glass on the backdoor had been broken.

The jury certainly would have been entitled to discount the story that St. Jean had been injured in a fight on the street;

indeed, not even St. Jean maintains that story was true. The jury also certainly would have been entitled to disbelieve his story to the police that the wounds on his hand had come from broken glass rather than a knife. By then his credibility was certainly open to question. I thus do not deny that the jury may have been entitled to find that the cuts must have come from a knife, notwithstanding St. Jean's alternative account at trial of why he had them. And, I suppose, as a result, the jury may then even have been permitted to infer that the knife must have been St. Jean's and, further, that he must have used that knife to stab Nova, even though St. Jean was not reported as ever having told anyone that was the case. But none of these inferences is so overwhelmingly supported by the evidence -- whether considered piece by piece or in combination -- that I can be confident the jury would not have been influenced by a powerfully incriminating statement from an eyewitness.

The majority does point to Aline Valery's testimony that she overheard St. Jean on the day of the stabbing say that he was looking for a "vic" and her additional testimony that St. Jean always carried a knife. Valery's testimony, however, was "scarcely unassailable." Foxworth, 570 F.3d at 436. The statement about St. Jean looking for a "vic" was made in the grand jury proceeding. At trial, however, Valery recanted and testified that it was Mathurin not St. Jean who had made that statement to her. And,

even if the recantation did not therefore cast doubt about her testimony more generally, her testimony did not provide particularly strong evidence that St. Jean had a knife with him that day.  Valery had known him only a few weeks, had seen him on only a handful of occasions, and in fact testified that she did not see him with a knife on the day of the stabbing.  So, it is difficult for me to see how we must proceed on the understanding -- for Brecht purposes -- that the jury credited this evidence from Valery.

Even if the jury did, though, we are not trying to assess whether the evidence was sufficient to support the convictions. We are trying to figure out whether the evidence of the cuts and the blood and Valery's statements -- when considered in light of St. Jean's defense -- so strongly supported a finding that St. Jean personally stabbed Nova that we are left with no "grave doubt" about the influence on the jury of Gallett's statement identifying St. Jean as a participant in the crime.  I do not see why we would conclude that the evidence was strong in that sense.

Finally, the majority notes -- correctly -- that the Commonwealth was proceeding on a joint venture theory, such that the jury "was not required to pick only one murderer."  But, as I noted above, St. Jean did not dispute that Gallett had stabbed Nova.  His defense was only that he had not participated in the crimes.  And, while it is true that a finding that St. Jean

personally participated in the killing was not necessary to find him guilty on a joint venture theory, only such a finding could have supported St. Jean's conviction for murder by reason of extreme atrocity or cruelty. And the theory that St. Jean was one of the individuals who stabbed Nova was also the Commonwealth's lead theory of the case and the only theory of guilt as to St. Jean for which the SJC found sufficient evidence. See Gallett, 119 N.E.3d at 659. Nor was there a special verdict form. So, I do not see how the fact that the joint venture theory was available to the jury shows that the Gallett statement had no influence on the jury's assessment of St. Jean's guilt.

This case, then, is not one in which, as in Sinnott, the "relative strength of the properly admitted evidence of guilt" weighs in favor of finding that the Brecht standard is not met. 139 F.3d at 18 (quoting Levasseur, 70 F.3d at 193). In denying habeas relief from a Bruton error there, we concluded that the prosecution's case was "impressively cogent." Id. at 20. We explained that multiple eyewitnesses had provided testimony on the "core" issue of defendant's guilt that was "remarkably consistent and corroborative," and that, together with a pathologist's testimony "present[ed] a cohesive, consistent picture" of the defendant's involvement in the charged assault. Id. at 19. By contrast, we explained, the defendant's "[un]impressive" defense comprised entirely of the -- questionable -- claim that all the

- 69 -

eyewitnesses were intoxicated and that their testimony was therefore unreliable. Id. at 19-20.

In this case, the record is very different. There was no eyewitness testimony about St. Jean's participation in the crime at all -- save, of course, for the testimony from Gallett himself. The entirety of the Commonwealth's case, therefore, depended on the jury drawing inferences from circumstances that certainly placed St. Jean in the house where Nova was killed but did not in any direct way identify St. Jean as someone who had stabbed Nova. In addition, St. Jean had an explanation for all the circumstantial evidence against him that, although far from airtight, was itself coherent and therefore capable of being credited. There was in fact evidence of broken glass at the backdoor to the Hyde Park house; Gallett likewise told police that they had entered the house by breaking glass; and St. Jean raised some question as to whether the cuts on his hand were consistent with him having acquired them from using a knife, as the Commonwealth alleged. Nor is it incredible that a person at the scene of a crime would be reluctant to disclose facts that would place him there.

**b.**

It is against this backdrop, that we must evaluate the impact of Gallett's statement for purposes of Brecht. Critically, we must, given Gray, treat the statement as having done the very thing that none of the Commonwealth's other evidence did: provide

a blow-by-blow eyewitness account of St. Jean's conduct before, during, and after the slaying. And that account hardly undermined the Commonwealth's theory of St. Jean's guilt. It powerfully supported it by placing St. Jean with Nova in the room where Nova was found dead, before he was dead; indicating that St. Jean had a knife at the time; and describing St. Jean, after Nova's stabbing, cleaning a knife and "cleaning all the blood."

In concluding that Gallett's statement was important to the Commonwealth's case against St. Jean, notwithstanding the circumstantial evidence described above, I emphasize that I am not relying solely on my own necessarily somewhat removed assessment of the statement's impact on the jury. Nor am I positing a jury that was unusually susceptible to being swayed by St. Jean and so, for that reason, willing to reject an objectively overwhelming circumstantial case against him. My assessment of the Gallett statement's influence on the jury merely parrots the assessment -- unmentioned by the majority -- that the Commonwealth itself advanced in state court in seeking to explain why the case it had just made to the jury sufficed to support the charges St. Jeans faced.

In that regard, I note that, after the close of evidence, the Commonwealth opposed St. Jean's motion for a required finding of not guilty as to principal liability because of what it contended that the record showed regarding St. Jean's having had

a knife that was used in Nova's stabbing. Tellingly, though, in doing so, the Commonwealth did not rely on the evidence in the record that the majority describes as being so substantial that "in all probability" it would have influenced any rational jury to find that St. Jean was involved in Nova's stabbing. Instead, the Commonwealth chose to rely on what the majority treats as the beside-the-point statement from Gallett, as the Commonwealth argued that "there [was] evidence, <u>based on Mr. Gallett's [confession]</u>, that Mr. St. Jean had that knife . . . and was involved at some point in stabbing Mr. Nova" (emphasis added).

Given that the Commonwealth itself appears to have been of the view that Gallett's statement provided the difference-making evidentiary support for a finding that St. Jean had a knife at the time of the attack, it is hard for me to see how we can say with confidence that the statement's introduction to the jury had no influence on it. All the charges against St. Jean would have been impacted by a finding that he had a knife at the time. So, a statement that the Commonwealth itself thought sealed the deal in showing that St. Jean had such a weapon would seem hard to discount.

This, then, is not a case -- if the Commonwealth itself is to be believed -- where I can see a basis for having confidence that the <u>Bruton</u> error added "little" to "nothing" to other accounts. <u>Sinnott</u>, 139 F.3d at 20. Nor is it a case where the

challenged confession -- here, Gallett's statement -- was "inherently implausible" or "contradicted" other substantial evidence.[13] Id. To the contrary, because the other evidence in the case was at least susceptible to multiple interpretations -- including St. Jean's -- Gallett's narration indisputably went to "central" issues in the Commonwealth's case against St. Jean. See id. at 18. By providing the jury with the only firsthand account of what happened inside the Hyde Park house and the events that led to Nova's death, the statement from Gallett provided a powerful and coherent narrative that explained the otherwise circumstantial proof of St. Jean's guilt. No doubt, that is why the Commonwealth thought to rely on it to fend off St. Jean's sufficiency challenge.

**3.**

Even without Gallett's statement, the jury might have disbelieved St. Jean's account and credited the inferences that the Commonwealth urged it to make. My concern, though, is that Gallett's statement was influential precisely because it

---

[13] I cannot agree with the majority's conclusion that the impact of Gallett's statement must be discounted because it likely would have "fared poorly in the jury's minds." Sinnott v. Duval, 139 F.3d 12, 20 (1st Cir. 1998). To the contrary, both the Commonwealth and Gallett's attorney encouraged the jury to rely on Gallett's statement -- the Commonwealth for the very evidence the majority suggests is unreliable. In any event, unlike in Sinnott, Gallett's statement was consistent with the remaining evidence and there was no real suggestion that it had been "fabricate[d]." Id.

inculpated St. Jean so directly in a case resting otherwise entirely on circumstantial evidence. Adding to that concern is the fact that the statement was introduced to the jury at the end of the trial. As such, it arguably would have had the powerful effect of tying together and explaining all the previous evidence. Indeed, as the last piece of evidence, it provided the jury's final impression before closing arguments and deliberations. Cf. Sinnott, 139 F.3d at 18, 21 (considering "the extent to which the error permeated the proceeding" (quoting Levasseur, 70 F.3d at 193)).

I do recognize that assessments under Brecht are necessarily fact specific. I am not aware, however, of any prior precedent of ours in which we have held that the Brecht standard was not met in a case analogous to this one. Nor, I note, does either the majority or the Commonwealth identify one.

## II.

Bruton's premise is that there is good reason to think that a jury, when faced with the "powerfully incriminating extrajudicial statements of a codefendant," will be unable to follow the court's instructions to disregard that evidence. 391 U.S. at 135-36. Gray built on that premise by holding that the concern Bruton expressed about how a jury will go about its deliberations is no less true when the co-defendant's statement is

revised to substitute obvious blanks in place of references to the non-confessing defendant.  523 U.S. at 195.

Assuming, then, as I must, that the jury considered Gallett's confession when deliberating on St. Jean's guilt, I find it at least "probable" -- in the sense required by Brecht -- that the statement would have "tipped the balance" against St. Jean, Foxworth, 570 F.3d at 436, regardless of whether it is more likely than not that it altered the outcome at trial, Kyles, 514 U.S. at 434-36.  At the very least, I entertain "grave doubt" about whether the statement had such an influence.  Foxworth, 570 F.3d at 436 (quoting McAninch, 513 U.S. at 437).  And, because I lack the requisite confidence that the Bruton error "did not influence the jury, or had but very slight effect," Sinnott, 139 F.3d at 15 (quoting Kotteakos, 328 U.S. at 764), I conclude that the Brecht standard has been met.  I thus would hold, contrary to the majority, that a writ of habeas corpus must issue, and so I respectfully dissent from the decision to deny the writ.